```
                                              United States Courts
                                            Southern District of Texas
                                                     FILED
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS                        AUG 1 4 2015
HOUSTON DIVISION
                                            David J. Bradley, Clerk of Court
```

CARLOS GARCIA CARRILLO

    Plaintiffs

vs.                                                C.A. **H-15-2365**

SOUTHWEST KEY
PROGRAMS, CASA HOUSTON

    Defendant                                JURY TRIAL DEMANDED

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

       NOW COMES, CARLOS GARCIA CARRILLO ( hereinafter referred to as "GARCIA " or Plaintiff"), complaining of SOUTHWEST KEY PROGRAMS ( herein after referred to as "SKP" or Defendant ), and for cause of action would respectfully show the following:

I.

## PARTIES

1.    Plaintiff, CARLOS GARCIA CARILLO is a 63 year old male. He is a Resident alien of the United States, the State of Texas and is a resident of Harris County, Texas

2. Defendant is a government contractor located in Houston, Harris County Texas, and may be served with process by serving their registered agent, Marisela Saldana, Program Director of Casa Houston at 1550 La Concha Lane, Houston, Texas 77054

II.

JURISDICTION AND VENUE

3 Plaintiffs bring this action against Defendant for its violation of Plaintiff rights pursuant Titles of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991 and the relatives for 1- Breach of contract and detrimental reliance 2-Retaliation, 3-Damage of personal image and professional prestige 4-Unjustified retention of personal documents and 5-violation of privacy of legal documents protected by the privileges of attorney-client relationship. Plaintiff invokes this Court's jurisdiction pursuant to 42 U.S.C. section 2000e-5 and 28 U.S. C. § 1331.

4. All conditions precedent for jurisdiction have been met. Plaintiff timely is filling charges of 1-Breach of contract and detrimental reliance 2-Retaliation, 3-Damage of personal image and professional prestige 4-Unjustified retention of personal documents and 5-Violation of privacy of legal documents protected by the privileges of attorney-client relationship.

III.

FACTS

5. Plaintiff brings action this cause of action against Defendants for violation of his rights under the Titles of the Civil Rights Act of 1964 and 1991, 42 U.S.C. §§ 2000e *et seq,* alleging claims of breach of contract and detrimental reliance, retaliation , damage of personal image and

professional prestige, unjustified retention of personal documents and violation of privacy of legal documents protected by the privileges of attorney-client relationship.

6. Plaintiff was employed as a Medical Coordinator by Defendant SKP for a period of time starting from April 13, 2015 , (I cannot present this contract as an exhibit because this document was subtracted among many other from some personal folders as described at paragraph 26 ) All of this time I was at SKP Casa Houston, 1550 La Concha Lane, Houston TX 77054.

7. As long as my first week there, I was in a training from days 13 to 17 with Mr. Kevin Rodriguez. On next week from April 21 till June 1st. I was in the Medical Coordination area working 8 hours a day five days a week. sharing my room with Keyla Sanchez the other medical coordinator, who was responsible to support my introduction to this position.

8. In my area, there was not a current Manual of Procedures for all the multiples activities I needed to do, there were some, but obsoletes due to multiples changes in the system. So I depended of my coworker to obtain this information. Since the beginning of these activities y felt poor support and bad feelings from this other medical coordinator, every time I ask for help about some procedure, her answer was confuse and very fast , and if I asked her to repeat it, she do it at same fast speed, but in different order, trying to confuse me. In one of this times she told me ""you don't understand, because your brain doesn't catch anything"".

9. In the meeting with the Director of the Program, Marisela Saldana, described below in paragraph 13, she said, that this medical coordinator told her that she doesn't like, and she was not good, supporting in training courses. So, knowing this, Ms Saldana could avoid many of my problems, asking the support of other medical coordinators available since my first week at the Medical Coordination area., this even before I let her know the problem., this is prevision for an administrator.

10. The conduct of this coworker with me, was beyond her limitations as instructor, she was singing or listening music as we were working, blocking my concentration. She was using her computer to do Math tests even interrupting my activities to ask me some questions confuse to her, like the meaning of the Math symbols "more than and less than". She knew for sure that SKP computers were for work related purposes exclusively. A summary of this blocking activities are described in a letter that I sent to the Medical Director of the program Dr. Fanny Rivera (Exhibit No.6 ).

11. In the next days I tried to do more than I needed to do, just to share my expertise and background knowledge in the benefit of my coworkers and the interns of this facility. These interns were minors from Latin America countries, all of them waiting for reunification with families in the USA. As a proof of my involvement with SKP mission and policies, I did a program of talks (Exhibit N. 1 ). The themes were approved for the medical director of the program, Dr. Rivera. She liked this talks to the point to ask me to do another talks schedule for all staff members ( Exhibit No.2 ).

12. As long as this program and in the following days I did never receive a good comment from the director of the facility, Marisela Saldana, which on the other side was prone in compliments to the other medical coordinator just for doing what she

must to do. After my first a talk to the staff, Ms. Saldana cancelled this talks, without give me a reason. She told me that I could continue with the talks to minors, what I did once a week without interruption as long as the seven weeks I worked in the facility.

13. On Monday June the 1st., the beginning of my 8th. week in this job, I was called to the office of Ms. Saldana just to be informed that I did a medication error, ( case No. 1 from Exhibit 4). The only one who could report this to her, was the other medical coordinator. Ms. Saldana denied this, saying that this was product of her own research, but in order to do this she needed at least to visit the area to revise some of the registers. She never went physically to my area, even when I was absent. I knew this because when I did the report of fleas on my chair (Exhibit N 3 ). She told me that I needed to have a chair in my area to avoid clients (minors) use my chair. But since the beginning of my activities there, there were two chairs for clients in the area.

14. I never, even now, accept like a medical error the incident that was reported, but I took in that moment, the opportunity to talk with her about all blocking activities from the other medical coordinator, I told her that I didn't report that before to prevent conflicts in the area, on the other hand, as long as I kept this situation intern, I never failed to complete my daily activities. The other reason for this, that I didn't say, was the assumption that in case of one confrontation, for sure Ms. Saldana would take part to support the other medical coordinator point of view and not mine.

15. At this very moment, I found in addition, that this medical coordinator was trying to intimidate me too. When after she knew, I would leave the building at 9:00 pm she said, that the street in front of this, was very dangerous at night, and said that as an example, a coworker with the name Kristian was hit in the face for an estranger after

leaving the building, and later someone broke the windows of her car. The same coworker Kristian ( I guess, a close friend , because of the frequent visits to her during job time ) affirmed this in front of us. They both added that administrators of this facility did nothing about this. Ms. Saldana told me at this moment that this never happened. This was reported in clause 5 of exhibit No. 6.

16. As an important antecedent, I want to say that the day before, Sunday May the 31st, while I was working, another coworker told me that most of personnel knew that the other medical coordinator was trying to do all what she can to make my life impossible there, and to get I was fired, even manipulating minors against me. I understood in that moment, why a particular female minor with Diabetes Type I ( case reported as a medication error 2 in exhibit No.4 ), suddenly looked upset to me when appears for medication. This staff member added too, that this medical coordinator had done the same pattern before with other medical coordinators always successfully.

17. As a conclusion of my meeting with Ms. Saldana on that morning I request to have a confrontation with her and the other medical coordinator as soon as possible to solve this problems in the benefit of our participation in the medical area. The answer of Ms. Saldana was that this meeting will be next day at 1:30 pm.

18. Later on the same day she called me again, to let me know that she found as long as that same morning, two other medication errors, (cases 2 and 3 from Exhibit 4) and she told me that as a consequence I will be in suspension from my activities in that center until further investigation was concluded.

19. Upon information and belief, it is asserted that Ms Saldana took the decision to suspend me, to avoid the confrontation between the other medical coordinator

and myself, programmed for the following day.

20. She requested at that time that I give her back, my radio, my badge, the magnetic key of the building and the keys of my office. The assistant director Alvaro Eli Hernandez was present, I asked both of them how long will it take to conclude this investigation, this in order to know my future in this organization, and he told me that this would be fast, usually a couple of days.

21. Ms Saldana gave me at this moment a document stating my suspension and requesting my signature, I agree to sign it only if I receive a copy of this document, she refused at that time, so I declined to sign, then she change of mind and accepted to give me a copy and I signed the document under this premise.

22. I was instructed for the assistant director to pick up my belongings at my office, he was very close to me at all times since that moment. I picked up in a rush manner my personal items, basically my briefcase and a lunch keeper,

23  A significant incident happen at this time, I forgot two folders with legal and personal documents in a table at the backside of my chair. I didn't see it because a minor was inside with another staff member waiting for me. I usually kept personal folders into my briefcase, but in the middle of this final conference, I needed to take some papers from these folders just to prove to Ms Saldana how important was one of the cases reported as medical error. (case 2 from exhibit 4). I kept a personal double control of this case, because the insulin administration in that minor was a potential risk life condition.

24. When I returned to Ms. Saldana, ready to leave the facility, she changed of mind and refused to give me a copy of the document I signed, I told her that this

condition was unfair to me because it would put me into a indefensible status, because you cannot defend by yourself without a writing document against your actions. With no other option, and trying to avoid conflicts, I left the building without the promised document.

25. I left the facility as a delinquent at the sight of staff members and minors, they had observed me in other times as a reliable worker, and lecturer of multiple themes. The assistant director gave me the order to do not speak to anyone. I did respect till now this order.

26. After driving 5 minutes I stopped, just to find that I forgot the folders including the very important legal documents. Immediately I returned to the facility, I was not allowed to pass the door, so I asked to an assistant with the name Felipe Licea to take for me the folders I forgot, I explained clearly to him that they contained personal information and legal documents only for my eyes. He went then from this site directly to my office.

27. After more than 15 minutes, in a walking way that from the front door to my office take approached one minute, he returned with the documents but he told me that he will keep them till next day by orders of Ms Saldana. I insisted that I needed these papers for a legal proceeding not related with SKP, but he refuses at all the times. After begging many times unsuccessfully I requested to him to seal this folder to maintain its confidentiality, the assistant director who was at all times as my shadow refuses this, but the other employee agreed and did it in front of me.

28. Again as long as this time, many staff members and minors were watching the incident, thinking for sure that I committed a serious offense or violation that made

me be fired.

29. That afternoon I sent an email to the Medical Director of the program, Dr. Fanny Rivera ( Exhibit No. 6 ) explaining all what happened on this day and asking for her intervention. I always relied on her, but I never received an answer.

30. Next day at the morning, on June 2nd. I asked Mr. Felipe about my folders, he gave me then a folder, but with different presentation and in consequence without the seals he put the day before. When I revised this folder, many of my personal documents disappeared including my SKP contract and other relatives, and instead appeared some other with information and procedures that I never received before, the legal documents were there but in different order.

31. I did receive a document too, (Exhibit No.4 ) that supposed to be a copy of the document I signed before, but without my signature, so I had no guarantee that was in the same terms of which I signed before.

32. The retention of the legal documents had two effects on my person, first I delayed a step on legal a proceeding that I had with an attorney, and second, because the tape seal was broken and the content manipulated for at least other staff member, they lost confidentiality, they were exposed to other eyes, and broken my personal security because of the nature of this legal documents. In addition they were potentially copied .

33. On June 3 after I read the document (Exhibit 4). I sent to Ms. Saldana my writing answer to that document ( Exhibit No. 5 ) , four pages describing step by step why under my consideration no one of the three medication errors reported were valid.

34. After more than a week without answer from Ms. Saldana, or Dr. Rivera, on June 10, I sent another email to the medical director of the program ( Exhibit No. 7 )

and again I never received an answer.

35. On July 1, after a complete month in suspension I did receive a call from Ms. Saldana to inform me, that she had a decision over my situation, we did an appointment for next day at the morning. I went there and I did receive a document which stated that I was out of the organization. This without any information about the final results of the medication errors under investigation.

36. As long as the seven weeks that I served as a medical coordinator with SKP I arrived on time every day, I never left the facility before my leaving time, I did all my activities in according with the policies and in the way they were described in the training course of the very first week. I completed all the professional development courses scheduled, and I followed all the procedures to get my Medical Assistant certification in the way Dr. Fanny Rivera recommended to me.

37. As I was instructed to, I never used my computer for activities other than SKP procedures. And I never till now, have had any conversation or meeting with minors or personnel from SKP Casa Houston outside this facility.

38. Upon information and belief, it is asserted that Ms Saldana took the decision to break my contract as a retaliation for my documents described as exhibits No.6, 7 and 8 and as a result of the events that happened on June 1st, 2nd. 3rd. and 10th. Described in paragraphs 13-34.

39. Upon information an belief it is asserted that Ms. Saldana gave priority to the protection of the other medical coordinator activities, who showed lack of medical knowledge in diabetes, (confounded even penicillin with insulin), over the serious health risk of a minor with diabetes type 1. as described in case 2 from exhibit 5.

40. Upon information and belief it is asserted that Ms. Saldana gave priority to attack my medical participation, instead to keep the well-being of a minor that was in need of a dental adhesive of $ 2.00 dolls. and even though he was suffering without eat properly and affected in his self teem due to the other peers mockery. As described in case 3 from exhibit 5.

. 41. Upon information and belief it is asserted that Ms. Saldana failed to ponder the cost-benefit of a medical treatment in the case of medication error 1. The medical condition of the minor, (Tiña Pedis) was still there, the medicine ( Ketoconazol ) was still there, it remained at least 20% of the tube, there were no side effects till the moment with this medication, but the physician who prescribed this, was not (Dr. Mora Amador). To ask our medical provider (Dr Jason Urtis) would represent the cost of a consultation. On the other hand the length of this treatment is 6 weeks, So I just extend two days over the current length of medication (two weeks). It is obvious that Ms Saldana and the other medical coordinator were egger to file a report to damage my image. Even this coordinator marked with big capital letters on the white board ""MEDICATION ERROR"" . This case is described as case 1 in exhibits 4 and 5.

42. The last 15 years of my labor background in this city I have been working as a teacher, Ms. Saldana knew this at the moment of my contract. The right moment to look for a position in this field is on months : April, May and June of every year. April and May I was working in this position whishing at least to complete a year in what is my other background, the medical area ( I worked 26 years of my life as a physician). I lost the other month, June, waiting for a decision from SKP, this because I was still under a contract. As a final consequence I am right now unemployed and looking for a position

which as a teacher will be difficult to find at this time of the year, and as a medical assistant will be worst due to the damage to my personal image and professional prestige.

IV.

CLAIMS FOR RELIEF

RETALIATION

43   Plaintiff incorporates paragraphs 12, 13, 14, 15, 16, 18, 19, 20, 21, 24, 27, 30, 31, 32, 33, 34, 35, 38, 39, 40 and 41, herein by reference as if set forth verbatim.

44.   Defendant employs more than 15 persons and are therefore employers with the meaning of Titles of the Civil Rights Act of 1964, as amended and the Civil Rights Act of 1991, as amended.

45.   Defendant's acts and omissions, by and through its agents and employees, as set forth herein, constitute unlawful retaliation and such conduct violates Titles of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* and the Civil Rights Act of 1991, as amended.

46.   Plaintiff further alleges that the retaliation against him was intentional and willful within the meaning of the above described statutes, and done with recklessness and malice. Accordingly, Plaintiff is entitled to recover for the damages inflicted upon him as a proximate result of Defendants' negligent and/or intentional violation of said statutes.

47.   Defendant and its agents engaged in unlawful employment practices, consisting of retaliation against Plaintiff with respect to the terms, conditions and privileges of employment by denying him the opportunity to probe his arguments and/or cancelling his contract upon learning of complaints described in exhibits 5, 6 and 7.

48. At all times mentioned herein, all persons employed by Defendant as Keyla Sanchez, Alvaro Eli Hernandez and Felipe Licea were acting as agents for Defendant and were acting within the course and scope of their authority, agency and/or employment with Defendants. Plaintiff gives notice that he intends to rely upon the doctrine of respondeat superior and principal/agency law.

49. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages in the form of back pay, lost wages, front pay, future pecuniary losses, lost employment benefits, severe emotional distress, mental anguish, worry, severe grief, shame, humiliation and damage to his personal and professional reputation for which Defendants are liable.

50. Plaintiff is entitled to recover actual, compensatory as well as punitive and exemplary damages.

51. Plaintiff alleges negligence on the part of Defendant through its agents, servants, and/or employees who were at all times acting within the course and scope of their employment, such negligence includes, but is not limited to:

    a. Failing to provide and maintain a peaceful and collaborative work environment.

    b. Failing to adequately train their employees concerning the federal laws.

    c. Failing to adequately train and supervise their employees.

    d. Failing to preserve the health and well-being of the minors inside that facility in order to protect interest of other employees.

52. Each of the foregoing acts or omissions whether taken singularly or in any combination was a proximate cause of the incidents and damages made the basis of this action.

53. The conduct of Defendant, described herein, was willful and/or malicious so as to entitle Plaintiffs to recover exemplary/punitive damages to punish Defendants for the continuing conduct and to deter such conduct in the future. Accordingly, Plaintiff asks that exemplary damages be awarded against the Defendant in a sum within the statutory requirements and within the jurisdictional limits of this Court.

BREACH OF CONTRACT AND DETRIMENTAL RELIANCE

54. Plaintiff incorporates by reference paragraphs 6, 30, 35, 36, 37, 38, 39, and 42, herein in reference as is Seth forth verbatim.

55. Plaintiff and Defendant entered into a written contract. Defendant breached its contract with Plaintiff when it rescinded its offer of employment after Plaintiff had already begun working as long as 7 weeks and 4 more weeks of suspension.

56. Plaintiff detrimentally relied on the representations of Defendant that he in fact had a job for the upcoming year and as a result of his reliance on theses representations. Plaintiff did not pursue other offers of work as long of months April, May and June, when possibilities were high to get a job as a teacher, position that Plaintiff have been doing as long as the last 15 years in this city.   .

57. Plaintiff has suffered damages as a result of Defendant's actions and is unable to secure another position in the educative field for the 2015-2016 scholar year. but too as a medical assistant due to damages to his image and professional reputation.

58. In addition, Defendant did not pay Plaintiff for the approximately one month

of work while he was waiting the results of an investigation, this final information never was given to Plaintiff.

59. In addition, Plaintiff has suffered damages in the form of lost wages totaling at least $ 3,000.00 in addition to at least 60,000.00 in collateral damages.

DAMAGE OF PERSONAL IMAGE AND PROFESSIONAL PRESTIGE:

60. Plaintiff incorporates by reference paragraphs 25, 26, 27 and 28 as is Seth forth verbatim.

UNJUSTIFIED RETENTION OF PERSONAL DOCUMENTS:

61. Plaintiff incorporates by reference paragraphs 23, 26, 27, 30 and 32 as is Seth forth verbatim.

VIOLATION OF PRIVACY OF LEGAL DOCUMENTS PROTECTED BY THE PRIVIEGIES OF ATTORNEY-CLIENT RELATIONSHIP.

62. Plaintiff incorporates by reference paragraphs 26, 27, 30. and 32 as is Seth forth verbatim.

V.

JURY TRIAL

63. Plaintiff has made a proper demand for trial by jury.

VI.

DAMAGES

64. Plaintiff seeks recovery from Defendant for the damages to which he is entitled due to Defendants', retaliation, intentional infliction of emotional distress and breach of contract and all other wrongful conduct alleged herein. Plaintiff seeks to recover lost wages, future pecuniary loss, emotional pain, suffering, mental anguish,

attorneys' fees and other non-pecuniary losses. Plaintiff further seeks any other relief authorized under the Titles of the Civil Rights Act of 1964 and the Civil Rights Act of 1991, and any other applicable law or statute, both State and Federal.

65. Due to nature of the legal documents which privacy were violated and the intimidate actions against mi person for some members of SKP, I make them responsible for any action against my personal or familiar safety as long as and after this trial.

WHEREFORE, Plaintiff respectfully requests that the Defendant be cited to appear herein and that on final trial, Plaintiff recover judgment against Defendant for all compensatory damages, actual damages, pursuant to the Titles of the Civil Rights Act of 1964 and the Civil Rights Act of 1991, punitive damages, reasonable and necessary attorney's fees, exemplary damages, prejudgment and post judgment interest, costs of court and for such further relief, at law or in equity to which Plaintiff is justly entitled.

Respectfully submitted,

CARLOS GARCIA CARRILLO , PRO SE
3906 East Traditions
Houston, Texas 77082
(281) 764-6255